DAVID B. PICKER
ALAN B. EPSTEIN
NANCY ABRAMS
SPECTOR GADON & ROSEN P.C.
1635 Market Street, Seventh Floor
Philadelphia, PA 19103
(215) 241-8888

Attorneys for Plaintiff, Lisa Noon

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LISA NOON | : | |
| | : | |
| Plaintiff | : | Civil Action |
| | : | |
| v. | : | No. 1:12-cv-04544 |
| | : | |
| INTERNATIONAL BUSINESS MACHINES | : | |
| | : | |
| Defendant | : | |

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF
LISA NOON'S MOTION FOR A NEW TRIAL

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................1

II. RELEVANT TRIAL TESTIMONY ................................................................................2

III. DISCUSSION ...................................................................................................................5

    A. Standard For Motion For A New Trial .................................................................5
    B. The Jury's Verdict That IBM Did Not Retaliate Against Lisa
       Noon Was Against The Weight Of The Evidence ................................................6
    C. This Court's Jury Charge On The Standard For "A
       Preponderance Of The Evidence" Misled The Jury And
       Prejudiced Ms. Noon .............................................................................................8

IV. CONCLUSION .................................................................................................................9

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir.1994) ......................................................... 6

*Folger Adam Co. v. PMI Industries., Inc.*, 938 F.2d 1529, 1533–34 (2d Cir.1991) ........... 6

*Manley v. AmBase Corp.*, 337 F.3d 237, 244 (2d Cir. 2003) .............................................. 5

*Manley, supra.*, 337 F.3d at 244 ............................................................................................ 6

*Martin v. Moscowithz*, 272 Fed.Appx. 44, 48 (2d Cir. 2008) ............................................. 6

*Miller v. City of Ithaca*, 914 F.Supp.2d 242, 249 (N.D.N.Y. 2012) ................................... 5

*Mugavero v. Arms Acres, Inc.*, 680 F.Supp.2d 544, 558 (S.D.N.Y. 2010) ........................ 5

*Ostrowski v. Atlantic Mutual Insurance Cos.*, 968 F.2d 171, 187 (2d Cir.1992) ............... 8

*Turley v. ISG Lackawanna*, 960 F.Supp.2d 425, 445 (W.D.N.Y. 2013) ........................... 6

*United States v. Pujana–Mena*, 949 F.2d 24, 27 (2d Cir.1991) ......................................... 6

*United States v. Quinones*, 511 F.3d 289, 313 (2d Cir.2007) ............................................ 6

**Rules**

Federal Rule of Civil Procedure 59(a) ............................................................................. 1, 5

**Statutes**

42 U.S.C. §12101, *et seq.* .................................................................................................... 1

**Treatises**

*Sand, Modern Federal Jury Instructions* ¶73.01 (1992) ..................................................... 8

I.  **INTRODUCTION**

This matter arises out of the claims of Plaintiff Lisa Noon ("Noon") that Defendant International Business Machines ("IBM") failed to accommodate her disability, discriminated against her because of that disability, and retaliated against her because she requested a reasonable accommodation for that disability, all in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101, *et seq*. A jury trial was held before this Court from July 7, 2014 through July 10, 2014. During that trial, evidence was educed that Ms. Noon's supervisor, Lauren States ("States") retaliated against her after she pressed for the accommodations of a lighter laptop computer and the ability to travel business class on flights of over eight (8) hours by:

- taking away half of Ms. Noon's job and giving her international job duties and a number of her direct reports to Bowman Hall;

- only proposing accommodations that would remove Ms. Noon from her then current position;

- circulating negative comments about Ms. Noon's performance to hinder Ms. Noon's efforts to find another executive level job at IBM; and

- forcing Ms. Noon to take a series of short-term disability leaves and to go out on long-term disability, resulting in the termination of her employment with IBM.

Despite the overwhelming evidence of Ms. States' retaliation against Ms. Noon, the jury found that IBM did not retaliate against Ms. Noon. Therefore, pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 59(a), Lisa Noon now respectfully suggests that this Court must order a new trial on the issue of retaliation on the basis

that the jury's verdict regarding her retaliation claim was against the weight of the evidence.

In addition, Plaintiff's counsel made a timely objection to this Court's charge to the jury regarding the standard for proof by a "preponderance of the evidence" because this Court failed to note that Plaintiff would prevail if the scales were tipped "however slightly." It is respectfully suggested that this omission prejudiced Plaintiff and also necessitates a new trial on the issue of retaliation.

## II.    RELEVANT TRIAL TESTIMONY

Lisa Noon began working for IBM in its software group on May 10, 2000. Ms. Noon was hired as a Band 10 employee, the highest level an employee could hold without being an executive [Transcript of the July 7, 2014 through July 10, 2014 trial ("Tr."), pp. 43-44].[1] In May 2008, Ms. Noon was promoted to a Band D position (a first level executive) in the Dynamic Data Center, later known as the Cloud Computing Group [Tr., pp.49-50, 53]. Ms. Noon was hired into that position by Lauren States, who was also instrumental in having Ms. Noon's position classified as a Band D executive position [Tr., pp. 52-53, 148]. In her position in the Cloud Computing Group, Ms. Noon had global responsibilities that required her to travel extensively, including travel to Europe and Asia and included the direct supervision of eleven (11) IBM employees [Tr., p. 54].

During the first eight (8) months she worked with Ms. Noon, Ms. States viewed Ms. Noon as a rising star, pushing her to work at the Vice President level and stating she was "grooming [Ms. Noon] to be me" [Tr., pp. 104-106, 276, 278, 282, Defendant's Exhibits 10, 13

---

[1] Relevant pages of the Trial Transcript are attached to the Declaration of Alan B. Epstein, Esquire ("Epstein Decl.") as Exhibit "A".

and 16].[2] Ms. States was so impressed with Ms. Noon's performance that, on January 12, 2009, just eight (8) months after Ms. Noon began working for her, Ms. States gave Ms. Noon a performance rating of 2+, the second highest possible rating for an IBM employee and an unusually high rating for someone in a relatively new position [Tr., pp. 57-58, 246, Plaintiff's Exhibit 47 (Exhibit "E" to Epstein Decl.].

In the Summer of 2008, Ms. Noon began experiencing tingling in her left hand and arm. Those symptoms continued to get worse until, in October 2008, Ms. Noon aggravated a pre-existing injury to her neck, causing her arm to go numb and resulting in quite a bit of pain [Tr., p. 59]. Ms. Noon reported her medical condition to Ms. States, but downplayed its seriousness until early November 2008, when her symptoms forced Ms. Noon to seek medical care [Tr., pp. 60-63, Plaintiff's Exhibit 28 (Exhibit "F" to the Epstein Decl.)]. At her doctors' suggestion, Ms. Noon requested two accommodations, a lighter laptop computer to accommodate a ten pound lifting restriction, and an exception to the travel policy that would permit her to travel business class on flights of more than eight (8) hours [Tr., pp. 66-68; Plaintiff's Exhibit 43 (Exhibit "G" to the Epstein Decl.)].[3]

Ms. States first became aware of Ms. Noon's request for these accommodations in February 2009 [Tr., pp. 245-246, 288]. Once aware of Ms. Noon's request for accommodations, Ms. States' attitude and behavior toward Ms. Noon changed dramatically. On February 26, 2009, Ms. States told Ms. Noon to "think hard about [her] career" and gave Ms. Noon three (3)

---

[2] Defendant's Exhibits 10, 13 and 16 are attached to the Epstein Decl. as Exhibit "B," "C" and "D", respectively.

[3] In October 2008, IBM's travel policy was changed to require that all air travel, regardless of the length of the trip, be booked in coach unless a specific exemption was requested and granted. The policy permitted exemptions for medical reasons [Tr., pp. 55-56, 104, 351-352].

3

options to accommodate her condition: (1) to work part-time; (2) to work on a special project; and (3) to take a disability leave [Tr., pp. 106-107, 260]. Ms. Noon's condition forced her to take a medical leave of absence that was to last from March 9, 2009 through April 19, 2009. While Ms. Noon was out on that medical leave of absence, Ms. States informed her that Bowman Hall ("Hall") was joining their team and that Mr. Hall would be taking Ms. Noon's responsibilities in Europe and Asia.[4] At a meeting on May 12, 2009, just after Ms. Noon returned from her leave of absence, Ms. States formally announced that Mr. Hall had been given responsibility for Europe and Asia as well as supervisor responsibility for several of Ms. Noon's direct reports, all responsibilities that had been Ms. Noon's [Tr., pp. 108-109, 227, 264, 297, 309, 359].

The stress the changes in Ms. States' attitude toward her caused Ms. Noon necessitated that Ms. Noon take another medical leave of absence from June 25, 2009 through July 17, 2009 [Tr., p. 110-111, 194]. By early July 2009, Ms. States told Ms. Noon she should look for other jobs that would not require the type of travel Ms. Noon's current position included [Tr., p. 113]. During this time, Ms. States also gave almost all of Ms. Noon's remaining job responsibilities and the responsibility for all but two of Ms. Noon's remaining direct reports to Mr. Hall [Tr., pp. 114, 134, 267].

Ms. Noon did explore other positions within IBM, including positions in China and Australia. While Ms. States appeared to be supporting Ms. Noon's job search, she also began to make negative comments about Ms. Noon's job performance to other Vice Presidents and to her Human Resources partner, Karen Coakley ("Coakley"). Specifically, in a July 9, 2009 email

---

[4] While Mr. Hall did not formally join Ms. States' team until June, 2009, he began to work as "additional management" for Ms. States in April 2009 [Tr., pp. 356, 359].

4

chain regarding Ms. Noon's job search, Ms. States told Joao Perez, another IBM Vice President: "Lisa has not been able to master this role. Much because she has never had the direct line experience needed to progress client projects" [Tr., pp. 119-120, Plaintiff's Exhibit 102 (Exhibit "H" to Epstein Decl.)].[5] She also told Ms. Coakley that she was experiencing problems regarding Ms. Noon's performance and that Ms. Noon's background and skill set were not up to what was needed for the job she was doing [Tr., pp. 326-328].

After Ms. States gave the remainder of her job to Mr. Hall, and her efforts to find another position at IBM were unsuccessful, Ms. Noon was forced to take a series of short-term disability leaves and, ultimately, to apply for long-term disability [Tr., pp. 126-127, 234]. In certifying that Ms. Noon was totally impaired, her doctor, Dr. Lloyd Zucker stated that she was unable to work because attempts to alter her job were unsuccessful [Tr., pp. 128, 147, 199, Plaintiff's Exhibit 119 (Exhibit "I" to Epstein Decl.)].[6]

## III. DISCUSSION

### A. Standard For Motion For A New Trial

The Court may order a new trial pursuant to F.R.C.P. 59(a) when it concludes that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice, in other words, when the jury's verdict is "against the weight of the evidence." *Manley v. AmBase Corp.*, 337 F.3d 237, 244 (2d Cir. 2003); *Miller v. City of Ithaca*, 914 F.Supp.2d 242, 249 (N.D.N.Y. 2012); *Mugavero v. Arms Acres, Inc.*, 680 F.Supp.2d 544, 558 (S.D.N.Y. 2010). A motion for a

---

[5] In contrast, one of Ms. Noon's former managers, Dan Powers, wrote to other IBM Vice Presidents extolling Ms. Noon's performance and capabilities. There is no evidence that Ms. States ever gave a similarly glowing recommendation of Ms. Noon to anyone despite her review reflecting excellence in Ms. Noon's work just months before [Tr., pp. 122-124, 227].

[6] Ms. Noon also testified that she noted on her long-term disability application that she could not return to her job if an accommodation were made because her job had been taken away from her and she had tried everything she could to find another job [Tr., p. 234].

5

new trial may be granted even if there is substantial evidence supporting the jury's verdict. In assessing whether to grant a new trial, the Court may weigh the evidence, make credibility determinations, and need not view the evidence in the light most variable to the verdict. *Manley, supra.*, 337 F.3d at 244; *Martin v. Moscowithz*, 272 Fed.Appx. 44, 48 (2d Cir. 2008).

A new trail may also be granted if the court gives an erroneous instruction to the jury. A jury instruction is erroneous if it "misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Anderson v. Branen*, 17 F.3d 552, 556 (2d Cir.1994) (citing *Folger Adam Co. v. PMI Industries., Inc.*, 938 F.2d 1529, 1533–34 (2d Cir.1991)). Viewing the charge as a whole, the objecting party must prove that it was actually prejudiced by the erroneous charge. *United States v. Pujana–Mena*, 949 F.2d 24, 27 (2d Cir.1991). If it meets this burden, a new trial is necessary. *See, United States v. Quinones*, 511 F.3d 289, 313 (2d Cir.2007); *Turley v. ISG Lackawanna*, 960 F.Supp.2d 425, 445 (W.D.N.Y. 2013).

### B. The Jury's Verdict That IBM Did Not Retaliate Against Lisa Noon Was Against The Weight Of The Evidence

The evidence educed at trial plainly showed that, prior to the time she learned that Lisa Noon had requested accommodations for her disability, Lauren States viewed Ms. Noon as a rising star. Ms. States was effusive in her praise of Ms. Noon, sending complimentary e-mails, giving Ms. Noon the second highest rating possible after only eight (8) months in her position, and telling Ms. Noon that she was grooming Ms. Noon "to be me." Once Ms. States learned that Ms. Noon had requested accommodations for her disability, one of which would have required Ms. States to obtain approval from senior executives for an exception to IBM's new travel policy, Ms. States' attitude and conduct toward Ms. Noon changed dramatically.

The uncontested evidence shows that, after Ms. States learned that Ms. Noon requested accommodations for her disability, Ms. States:

- proposed only three "accommodations" all of which would have resulted in the removal of Ms. Noon from her position: (1) that she reduce her schedule to part-time, (2) that she be reassigned to a special project, or (3) that she take a disability leave of absence;

- took away half of Ms. Noon's job duties and the majority of her direct reports while Ms. Noon was on her first short-term disability leave of absence and gave those job duties and direct reports to Bowman Hall;

- suggested that Ms. Noon should find another job within IBM that did not require international travel;

- failed to support Ms. Noon's search for another job within IBM and actually denigrated Ms. Noon's performance and abilities to other Vice Presidents and to her Human Resources Partner;

- took away the remainder of Ms. Noon's job duties and direct reports, forcing Ms. Noon to go out on short-term and ultimately long-term disability, which in turn resulted in Ms. Noon being separated from her employment with IBM.

When viewed as a whole, the evidence regarding Ms. States' conduct after she learned that Lisa Noon requested accommodations for her disability fully supports a finding that Ms. States retaliated against Ms. Noon for requesting those accommodations. While Ms. States' testimony related her view that her actions were based upon legitimate business reasons for all of the adverse actions she took against Ms. Noon, the weight of the evidence indicates that she took those actions in retaliation for Ms. Noon's requests for accommodations for her disability. Therefore, it is respectfully suggested that a new trial must be ordered on the issue of retaliation.

### C. This Court's Jury Charge On The Standard For "A Preponderance Of The Evidence" Misled The Jury And Prejudiced Ms. Noon

As part of its charge to the jury, this Court described the standard for "a preponderance of the evidence as follows:

> Now, we started out with no evidence and the scales balanced absolutely equal. If you find, after hearing all the evidence, that the likelihood is still evenly balanced 50/50, maybe yes, maybe no, the scales have not tipped, then the plaintiff has failed to meet her burden, and the defendant prevails on that point. The balance must tip in favor of your believing that a particular event did occur or that a particular fact did exist in order for the plaintiff to meet the burden of proof required by law.

Tr., p. 507. At the conclusion of the charge, Plaintiff's counsel objected to this portion of the charge on the basis that the Court failed to explain that the scales only need to be tipped ever so slightly in Plaintiff's favor, but the Court overruled the objection [Tr., pp. 536-537].

The Court of Appeals for the Second Circuit has specifically stated that a proper charge on the standard for "a preponderance of the evidence" must specify that the jury must find a fact if the jury "find[s] that the scales tip, however slightly, in favor of the party with th[e] burden of proof" as to that fact. *Ostrowski v. Atlantic Mutual Insurance Cos.*, 968 F.2d 171, 187 (2d Cir.1992) (quoting *Sand, Modern Federal Jury Instructions* ¶ 73.01, at 73-4 (1992). The charge as given by this Court did not make it clear to the jury that they should rule in favor of Ms. Noon, even if the evidence she produced tipped the scales in her favor ever so slightly. As such, the jury was left to speculate that some greater tipping of the scales in her favor was necessary.

As discussed in detail above, the weight of the evidence established that Ms. States retaliated against Ms. Noon for requesting accommodations for her disability. The absence of the clarification that the scales only needed to tip in her favor "ever so slightly" undoubtedly contributed to the jury's failure to find in Ms. Noon's favor on her retaliation claim. As such,

8

Plaintiff was prejudiced by this misleading part of the Court's charge, necessitating a new trial on Ms. Noon's retaliation claim.

## IV. CONCLUSION

The weight of the evidence educed at trial established that Lauren State took various adverse actions against Lisa Noon after she learned that Ms. Noon had requested accommodations for her disability and because she had requested those accommodations. Therefore, the jury's verdict against Ms. Noon's favor on her retaliation claim was clearly against the weight of the evidence. Their failure to find in Ms. Noon's favor was undoubtedly caused in part by the absence from this Court's charge of the statement that the evidence in her favor only had to tip the scales "ever so slightly."

For all of the reasons discussed in detail above, it is respectfully suggested that this Court must order a new trial on the issue of retaliation.

Respectfully submitted,

SPECTOR GADON & ROSEN, P.C.

By: _____/s/ *Alan B. Epstein*_____
     David B. Picker, Esquire (DP-9658)
     Direct - (215) 241-8897
     dpicker@lawsgr.com

     Alan B. Epstein, Esquire
     Admitted *Pro Hac Vice*
     Direct - (215) 241-8832
     aepstein@lawsgr.com

     Nancy Abrams, Esquire
     Admitted *Pro Hac Vice*
     Direct – (215) 241-8894
     nabrams@lawsgr.com

*Attorneys for Plaintiff, Lisa Noon*

Dated: August 6, 2014